## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### BECKLEY DIVISION

| | | |
|---|---|---|
| **EVERLY K. HATFIELD,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO. 5:08-00160** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

### PROPOSED FINDINGS AND RECOMMENDATION

This is an action seeking review of the final decision of the Commissioner of Social Security denying the Plaintiff's application for Supplemental Security Income (SSI) under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383f. By Standing Order filed March 12, 2008 (Document No. 4.), this case was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence, and to submit Proposed Findings of Fact and Recommendation for disposition, all pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' cross-Motions for Judgment on the Pleadings. (Document Nos. 12 and 14.)

The Plaintiff, Everly K. Hatfield (hereinafter referred to as "Claimant"), filed an application for SSI on November 27, 2006 (protective filing date)[1], alleging disability as of August 1, 1998, due

---

[1] Claimant previously filed concurrent applications for benefits on March 12, 1992. (Tr. at 13, 48-51.) Claimant was found disabled as of June 1, 1990. (*Id.*) Payment of those benefits however, terminated in January, 1997, because "substance abuse was found to be a contributing factor material to his disability pursuant to Public Law 104-121." (Tr. at 13) An application for Disability Insurance Benefits subsequently was filed on August 24, 2001, and was denied initially and upon reconsideration. (Tr. at 13, 48-51.) After a hearing, ALJ R. J. Maddigan issued a decision on August 19, 2003, which denied Claimant benefits. (*Id.*)

to back problems, mental problems, hepatitis B and C, cirrhosis of the liver, and depression.[2] (Tr. at 13, 30, 45-47, 48-51, 65, 70.) The claims were denied initially and upon reconsideration. (Tr. at 30-32, 36-7.) On May 11, 2007, Claimant requested a hearing before an Administrative Law Judge (ALJ). (Tr. at 39.) The hearing was held on September 25, 2007, before the Honorable Geraldine H. Page. (Tr. at 247-65.) By decision dated October 18, 2007, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 13-22.) The ALJ's decision became the final decision of the Commissioner on February 8, 2008, when the Appeals Council denied Claimant's request for review. (Tr. at 5-8.) On March 12, 2008, Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (Document No. 2.)

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(I), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §416.920 (2006). If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. § 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. § 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. § 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. § 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the

---

[2] In his Request for Reconsideration, dated March 5, 2007, Claimant reported additional disabling conditions to include poor vision and hearing. (Tr. at 35.)

fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. 20 C.F.R. § 416.920(e). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. § 416.920(f) (2006). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration "must follow a special technique at every level in the administrative review process." 20 C.F.R. §§ 404.1520a(a) and 416.920a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in 20 C.F.R. §§ 404.1520a(c) and 416.920a(c). Those sections provide as follows:

> *(c) Rating the degree of functional limitation.* (1) Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.
> (2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such

factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.

(3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listings of Impairments.

(4) When we rate the degree of limitation in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace) and "none" in the fourth (episodes of decompensation) will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. 20 C.F.R. §§ 404.1520a(d)(1) and 416.920a(d)(1).[3] Fourth, if the claimant's impairment(s) is/are deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating

---

[3] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04, provides that affective disorders, including depression, will be deemed severe when (A) there is medically documented continuous or intermittent persistence of specified symptoms and (B) they result in two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation , each of extended duration or (C) there is a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities with symptoms currently attenuated by medication or psychosocial support and (1) repeated extended episodes of decompensation; (2) a residual disease process resulting in such marginal adjustment that a minimal increase in mental demands or change in the environment would cause decompensation; or (3) a current history of 1 or more years' inability to function outside a highly supportive living arrangement, and the indication of a continued need for such an arrangement.

4

and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. 20 C.F.R. §§ 404.1520a(d)(2) and 416.920a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the Claimant's residual functional capacity. 20 C.F.R. §§ 404.1520a(d)(3) and 416.920a(d)(3). The Regulation further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision issued by the administrative law judge and the Appeals Council must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(2) and 416.920a(e)(2).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because he had not engaged in substantial gainful activity since the application date, November 27, 2006. (Tr. at 15, Finding No. 1.) Under the second inquiry, the ALJ found that Claimant suffered from degenerative disc disease of the lumbosacral spine with a small, L4-5 herniated disc and L5-S1 disc bulging with grade I spondylolisthesis; major depression with anxiety; and an alleged history of hepatitis B and C with cirrhosis of the liver, which were severe impairments. (Tr. at 15, Finding No. 2.) At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any listing in Appendix 1. (Tr. at 16, Finding No. 3.) The ALJ then found that Claimant had a residual functional capacity for light exertional work

> consisting of lifting and carrying 20 pounds occasionally, 10 pounds frequently, standing/walking and sitting 6 hours each in an 8 hour day, except that due to his musculoskeletal impairment, alleged liver condition and pain, he can only

occasionally kneel, crouch, stoop and crawl, and can perform work that does not require working around hazardous machinery, at unprotected heights, or that requires climbing ladders, ropes and scaffolds. He can perform work that allows him to avoid concentrated exposure to excess humidity, pollutants and irritants. Due to his psychiatric impairments and pain, he is limited to work involving occasional interaction with the general public, and perform work entailing one-to-two step tasks, i.e., unskilled work.

(Tr. at 17, Finding No. 4.) At step four, the ALJ found that Claimant could not return to his past relevant work. (Tr. at 21, Finding No. 5.) On the basis of testimony of a Vocational Expert ("VE") taken at the administrative hearing, the ALJ concluded that Claimant could perform jobs such as a laundry folder, garment folder, and laundry laborer, at the light exertional level. (Tr. at 21-22, Finding No. 9.) On this basis, benefits were denied. (Tr. at 22, Finding No. 10.)

Scope of Review

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as:

evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

Claimant's Background

Claimant was born on September 9, 1960, and was 47 years old at the time of the

administrative hearing. (Tr. at 21, 45, 250-51.) Claimant had a seventh grade, or limited education, and no vocational training. (Tr. at 21, 74, 251.) In the past, he worked as a welder/unskilled laborer. (Tr. at 71-72, 76-83, 261-62.)

The Medical Record

The Court has reviewed all evidence of record, including the medical evidence, and will discuss it below as it relates to Claimant's arguments.

Claimant's Challenges to the Commissioner's Decision

Claimant asserts that the Commissioner's decision is not supported by substantial evidence because the ALJ erred in (1) discrediting the reports of Claimant's medical providers, (2) assessing Claimant's pain and credibility, and (3) relying on the VE's response to a hypothetical question that did not set out all the evidence regarding Claimant's impairments. (Document No. 13 at 7-9.) The Commissioner asserts that Claimant's arguments are without merit and that substantial evidence supports the ALJ's decision. (Document No. 14 at 8-15.)

1. Medical Opinion Evidence.

Claimant first alleges that the ALJ improperly discounted the opinions of Dr. Hasan and Dr. Cabauatan and gave greater weight to the opinions of the state agency psychologists, Dr. Smith and Dr. Harlow, and the state agency physicians, Dr. Reddy and Dr. Lambrechts. (Document No. 13 at 7-8.) Claimant asserts that Dr. Hasan's findings are supported by his examination of Claimant and the examination and testing by Sunny Bell. (Id. at 8.) Claimant further asserts that the ALJ "erred in faulting the [Claimant's] examining physicians for relying on his history of symptoms particularly when those symptoms are supported by both the examination from Dr. Dumapit as well as the radiological evidence found at 18F." (Id.)

The Commissioner asserts that contrary to Claimant's allegation, the ALJ did not discount entirely the opinions of Drs. Hasan and Cabauatan or rely entirely on the opinions of the state agency

physicians. (Document No. 14 at 10-12.) Rather, pursuant to the Regulations, the ALJ "correctly considered and fully explained the weight afforded to the medical opinion evidence of record." (Id. at 10.) Regarding Dr. Cabauatan's opinion, the Commissioner asserts that the ALJ properly accorded it minimal weight, as opposed to controlling weight, because Dr. Cabauatan examined Claimant on only one occasion to determine his eligibility for welfare benefits. (Id. at 10-11.) Furthermore, Dr. Cabauatan's opinion was not supported by objective findings and Dr. Cabauatan accepted Claimant's statements that he had hepatitis and cirrhosis without any corroboration. (Id. at 10-11.)

Likewise, with respect to Dr. Hasan, the Commissioner contends that though he found some abnormalities on examination, those findings did not support objectively the extreme limitations he assessed. (Document No. 14 at 11.) Moreover, Dr. Hasan consistently opined that Claimant's mental impairments were of listing severity but simultaneously assessed only mild to moderate limitations. (Id.) Thus, the ALJ properly found that Dr. Hasan's opinion, which was based on a single examination, was not consistent with his objective findings and was inconsistent with his conclusion regarding the listings. (Id.)

Finally, the Commissioner asserts that the ALJ properly accorded the opinions of the state agency physicians, Drs. Reddy, Lambrechts, Smith, and Harlow, some, but not controlling weight because they neither observed Claimant nor considered evidence submitted after their review. (Document No. 14 at 11-12.)

At steps four and five of the sequential analysis, the ALJ must determine the claimant's residual functional capacity for substantial gainful activity. "RFC represents the most that an individual can do despite his or her limitations or restrictions." See Social Security Ruling 96-8p, 61 Fed. Reg. 34474, 34476 (1996). Pursuant to SSR 96-8p, the RFC assessment "must be based on all of the relevant evidence in the case record," including " the effects of treatment" and the "limitations or restrictions imposed by the mechanics of treatment; e.g., frequency of treatment, duration,

disruption to routine, side effects of medication." Looking at all the relevant evidence, the ALJ must consider the claimant's ability to meet the physical, mental, sensory and other demands of any job. 20 C.F.R. §§ 404.1545(a), 416.945(a) (2006). "This assessment of your remaining capacity for work is not a decision on whether you are disabled, but is used as the basis for determining the particular types of work you may be able to do despite your impairment(s)." Id. "In determining the claimant's residual functional capacity, the ALJ has a duty to establish, by competent medical evidence, the physical and mental activity that the claimant can perform in a work setting, after giving appropriate consideration to all of her impairments." Ostronski v. Chater, 94 F.3d 413, 418 (8th Cir. 1996).

Opinions on a claimant's Residual Functional Capacity are issues that are reserved to the Commissioner. The Regulations state that:

> We use medical sources, including your treating source, to provide evidence, including opinions, on the nature and severity of your impairment(s). Although we consider opinions from medical sources on issues such as whether your impairment(s) meets or equals the requirements of any impairment(s) in the Listing of Impairments in appendix 1 to subpart P of part 404 of this chapter, your residual functional capacity . . . or the application of vocational factors, the final responsibility for deciding these issues is reserved to the Commissioner.

See 20 C.F.R. § 416.927(e)(2) (2006).

> In determining what a claimant can do despite his limitations, the SSA must consider the entire record, including all relevant medical and nonmedical evidence, such as a claimant's own statement of what he or she is able or unable to do.  That is, the SSA need not accept only physicians' opinions.  In fact, if conflicting medical evidence is present, the SSA has the responsibility of resolving the conflict.

Diaz v. Chater, 55 F.3d 300, 306 (7th Cir. 1995) (citations omitted).

The Regulations state that opinions on these issues are not medical opinions as described in the Regulation dealing with opinion evidence (20 C.F.R. §§ 404.1527(a)(2) and 416.927(a)(2)); rather, they are opinions on issues reserved to the Commissioner. 20 C.F.R. §§ 404.1527(e) and 416.927(e). For that reason, the Regulations make clear that "[w]e will not give any special

9

significance to the source of an opinion on issues reserved to the Commissioner. . . ." Id. §§
404.1527(e)(3) and 416.927(e)(3). The Regulations further provide that "[f]or cases at the
Administrative Law Judge hearing or Appeals Council level, the responsibility for deciding your
residual functional capacity rests with the Administrative Law Judge or Appeals Council." See 20
C.F.R. §§ 404.1545 and 416.946 (2006). However, the adjudicator must still apply the applicable
factors in 20 C.F.R. § 416.927(d) when evaluating the opinions of medical sources on issues reserved
to the Commissioner. See Social Securing Ruling ("SSR") 96-5p, 61 FR 34471, 34473 (1996).

Social Security Ruling 96-5p makes a distinction between an RFC assessment, which is "the
adjudicator's ultimate finding of 'what you can still do despite your limitations,'" and a "'medical
source statement,' which is a 'statement about what you can still do despite your impairment(s)'
made by an individual's medical source and based on that source's own medical findings." Id. SSR
96-5p states that "[a] medical source statement is evidence that is submitted to SSA by an individual's
medical source reflecting the source's opinion based on his or her own knowledge, while an RFC
assessment is the adjudicator's ultimate finding based on a consideration of this opinion and all the
other evidence in the case record about what an individual can do despite his or her impairment(s)."
Adjudicators "must weigh medical source statements under the rules set out in 20 C.F.R. § 416.927,
providing appropriate explanations for accepting or rejecting such opinions." Id. at 34474.

Every medical opinion received by the ALJ must be considered in accordance with the factors
set forth in 20 C.F.R. §§ 404.1527(d) and 416.927(d) (2006). These factors include: (1) length of the
treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship,
(3) supportability, (4) consistency, (5) specialization, and (6) various other factors. Additionally, the
Regulations state that the Commissioner "will always give good reasons in our notice of

10

determination or decision for the weight we give your treating source's opinion." Id. §§ 404.1527(d)(2) and 416.927(d)(2).

Under §§ 404.1527(d)(1) and 416.927(d)(1), more weight is given to an examiner than to a non-examiner. Sections 404.1527(d)(2) and 416.927(d)(2) provide that more weight will be given to treating sources than to examining sources (and, of course, than to non-examining sources). Sections 404.1527(d)(2)(I) and 416.927(d)(2)(I) state that the longer a treating source treats a claimant, the more weight the source's opinion will be given. Under §§ 404.1527(d)(2)(ii) and 416.927(d)(2)(ii), the more knowledge a treating source has about a claimant's impairment, the more weight will be given to the source's opinion. Sections 404.1527(d)(3), (4) and (5) and 416.927(d)(3), (4), and (5) add the factors of supportability (the more evidence, especially medical signs and laboratory findings, in support of an opinion, the more weight will be given), consistency (the more consistent an opinion is with the evidence as a whole, the more weight will be given), and specialization (more weight given to an opinion by a specialist about issues in his/her area of specialty). Unless the ALJ gives controlling weight to a treating source's opinion, the ALJ must explain in the decision the weight given to the opinions of state agency psychological consultants. 20 C.F.R. §§ 404.1527(f)(2)(ii) and 416.927(f)(2)(ii) (2006). The ALJ, however, is not bound by any findings made by state agency medical or psychological consultants and the ultimate determination of disability is reserved to the ALJ. Id. §§ 404.1527(f)(2)(I) and 416.927(f)(2)(I).

In evaluating the opinions of treating sources, the Commissioner generally must give more weight to the opinion of a treating physician because the physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. See 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2006). Nevertheless, a treating physician's opinion is afforded "controlling weight

11

only if two conditions are met: (1) that it is supported by clinical and laboratory diagnostic techniques and (2) that it is not inconsistent with other substantial evidence." Ward v. Chater, 924 F. Supp. 53, 55 (W.D. Va. 1996); see also, 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2006). The opinion of a treating physician must be weighed against the record as a whole when determining eligibility for benefits.  20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2006). Ultimately, it is the responsibility of the Commissioner, not the court to review the case, make findings of fact, and resolve conflicts of evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). As noted above, however, the Court must not abdicate its duty to scrutinize the record as a whole to determine whether the Commissioner's conclusions are rational. Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

If the ALJ determines that a treating physician's opinion should not be afforded controlling weight, the ALJ must then analyze and weigh all the evidence of record, taking into account the factors listed in 20 C.F.R. §§ 404.1527 and 416.927(d)(2)-(6).

Respecting Claimant's physical impairments, the medical evidence reveals that Claimant received treatment from Family Healthcare Associates, Inc., from December 2, 1988, through May 18, 2007. (Tr. at 185-99.) Claimant first complained of back pain on May 17, 1989, after lifting a heavy object. (Tr. at 193.) He was diagnosed with a low back strain and was prescribed Flexeril and Naprosyn, and was directed to use a TENS unit, heating pad, and ice, and to massage his back. (Id.) On October 31, 1989, Claimant's deep tendon reflexes and straight leg raising were normal. (Id.) Claimant reported intermittent back pain through May 18, 2007. (Tr. at 185-92.) On May 18, 2007, Claimant's reports of cirrhosis from Hepatitis C were documented, but there is no indication that medical records confirming the diagnosis were received. (Tr. at 186.) On November 22, 2000, a MRI scan of Claimant's cervical spine was negative and the scan of Claimant's lumbar spine revealed

degenerative disc disease at L4-5, as well as a small herniated nucleus pulposus at the same level. (Tr. at 129-30.)

On December 20, 2006, Dr. Ruperto D. Dumapit, M.D., examined Claimant at the request of the Agency. (Tr. at 144-50.) Claimant complained of back pain, depression, cirrhosis of the liver, and hepatitis B and C. (Tr. at 144-45.) Claimant described his back pain as continuous and burning in nature, with radiation to his hips and legs and an occasional numbness and tingling sensation in his legs. (Tr. at 144.) He rated his back pain at level eight out of ten. (Tr. at 144-45.) Regarding his depression, Claimant claimed disturbance with his social functioning and that crowds precipitated his anxiety. (Tr. at 144.) He further reported difficulty performing daily tasks, though he was able to manage his finances and denied suicidal ideation. (Id.) Finally, he reported that he was diagnosed with cirrhosis of the liver and hepatitis B and C in 2004, though he reported no complications from the conditions. (Id.) Despite these conditions, Claimant reported that he had not taken any medication since his release from prison in September, 2006. (Tr. at 144-45.)

On examination, Claimant reported a history of blurred vision and difficulty hearing, shortness of breath, chronic abdominal pain, headaches, and back pain. (Tr. at 145.) Claimant presented with moderate tenderness in the lumbosacral region on palpation, with reduced ranges of motion of the right hip with back pain. (Tr. at 146.) Straight leg raising on the right in supine position was positive with pain. (Id.) Dr. Dumapit observed decreased sensation to pinprick in both thighs, but normal muscle strength, grip strength, and fine manipulative tests. (Tr. at 147.) Claimant ambulated without any assistive devices and was able to walk in tandem, walk on his heels and toes, hop, and bend normally. (Id.) However, he was able to squat only partially due to pain, and arose from the squatting position with difficulty. (Id.) The x-rays of Claimant's lumbosacral spine revealed

13

a mild degree of spur formation. (Id.) In summary, Dr. Dumapit acknowledged Claimant's reports of back pain, depression worsening without medication, and a history of alcoholism with depression. (Id.) Dr. Dumapit however, was unable to confirm Claimant's reports of cirrhosis of the liver and hepatitis B and C due to the absence of records of the laboratory testing conducted in 2004. (Id.)

On January 8, 2007, Dr. Uma Reddy, M.D., a state agency physician, reviewed the medical evidence of record[4] and opined that Claimant was capable of performing medium exertional work with frequent limitations in climbing ramps and stairs, and balancing. (Tr. at 151-58.) All other postural activities were limited to an occasional basis. (Tr. at 153.) Dr. Reddy further opined that Claimant should avoid concentrated exposure to environmental irritants and hazards. (Tr. at 155.) Dr. Reddy found that Claimant's allegations of back pain were minimally credible because his recent consultative examination revealed only minimal limitations, without any walking or neurological deficits. (Tr. at 156.) Moreover, Dr. Reddy opined that despite Claimant's reports of liver problems with hepatitis B and C, such conditions were "not supported by any medical evidence either physical or lab work." (Id.) Dr. Reddy surmised that Claimant's limitations in activities of daily living were exaggerated. (Id.) On March 22, 2007, Dr. Marcel Lambrechts, M.D., affirmed Dr. Reddy's assessment and agreed that Claimant's "symptoms were out of proportion to the findings sent." (Tr. at 184.)

On March 21, 2007, Dr. L. N. Cabauatan, M.D., completed a form General Physical for the Department of Health and Human Resources. (Tr. at 200-02.) Dr. Cabauatan acknowledged Claimant's complaints of back problems, hepatitis B and C, and cirrhosis of the liver. (Tr. at 200.) He diagnosed hepatitis B and C, cirrhosis of the liver, and drug abuse. (Tr. at 201.) In view of the

---

[4] Dr. Reddy references only Dr. Dumapit's December 20, 2006, consultative evaluation. (Tr. at 158.)

diagnoses, Dr. Cabauatan opined that Claimant was unable to work full-time for one year. (Id.)

Claimant was examined by Dr. Francis Saldanha, M.D., of Charleston Pain Management Consultants as a new patient, on August 2, 2007, for complaints of back pain. (Tr. at 203-06.) On examination, Claimant maintained his gait and station without difficulty, but presented with significant trigger points involving the lumbar paraspinous muscles and facet joint tenderness in the lumbar area. (Tr. at 204.) Claimant's range of lumbar motion was diminished in all directions. (Id.) Neurologically, however, Claimant's examination was normal with normal muscle strength and tone, sensory response to touch and sharp sensation, deep tendon reflexes, and straight leg raising. (Id.) Dr. Saldanha reviewed an x-ray of Claimant's spine dated May 8, 2007, which demonstrated bilateral spondylosis of L5 and minimal listhesis at L5-S1 with narrowing of L4-L5 and L5-S1 disc spaces. (Tr. at 196, 205, 233.) Dr. Saldanha diagnosed lumbar spondylolisthesis and lumbar facet syndrome, and recommended a MRI. (Tr. at 205.) The MRI of Claimant's lumbar spine on September 6, 2007, revealed intervertebral disc bulging in association with a grade 1 spondylolisthesis at the L5-S1 level. (Tr. at 231.)

Respecting Claimant's mental impairments, the evidence reveals that on January 25, 2007, Sunny S. Bell, M.A., examined Claimant at the request of the Agency. (Tr. at 159-63.) Claimant complained of decreased energy; sleep difficulties; irritability; decreased libido; hopeless, helpless, worthless, and useless feelings; difficulty concentrating; difficulty making decisions; memory problems; and of being withdrawn and apathetic. (Tr. at 160.) He denied suicidal or homicidal ideations and hallucinations or delusions. (Id.) Claimant reported that when incarcerated, he received treatment for depression, but that once he was released, he could not afford treatment. (Id.) Regarding his education, Claimant reported that he quit school in the eighth grade and that he made below

average grades. (Tr. at 161.) He also noted that he was retained in the sixth and seventh grades. (Id.)

On mental status examination, Ms. Bell noted that Claimant was cooperative and motivated, but interacted in a socially hesitant manner, neither spontaneously generating conversation nor exhibiting a sense of humor. (Tr. at 161.) She noted poor eye contact and observed that his mood was depressed and his affect was restricted. (Id.) Ms. Bell further noted that Claimant's thought processes were logical and organized and that he reported no delusions, obsessions, or phobias. (Tr. at 162.) However, Ms. Bell opined that Claimant's judgment was severely deficient, his remote memory skills were mildly deficient, and his concentration was moderately deficient. (Id.) However, his immediate and recent memory skills were within normal limits and he exhibited no gross psychomotor difficulties. (Id.)

Ms. Bell diagnosed depressive disorder not otherwise specified and alcohol abuse, sustained, in full remission. (Tr. at 162.) Claimant reported his daily activities to include lying or sitting around on a heating pad, taking care of his own hygiene and grooming, cleaning his room, preparing simple foods, watching television, and managing his finances. (Tr. at 163.) He further reported that he visited family and attended family gatherings. (Id.) Ms. Bell opined that Claimant's persistence and pace were within normal limits. (Id.)

On February 7, 2007, Rosemary L. Smith, Psy.D., a state agency psychologist, reviewed the medical evidence of record and opined that Claimant's affective disorder resulted in mild limitations of daily living and maintaining social functioning and moderate limitations in maintaining concentration, persistence, or pace. (Tr. at 165-78.) Dr. Smith opined that Claimant had no episodes of decompensation. (Tr. at 175.) Dr. Smith also completed on February 7, 2007, a form Mental Residual Functional Capacity Assessment on which she opined that Claimant's mental impairment

16

would result in more than moderate limitations in his ability to understand, remember, and carry out detailed instructions, and maintain attention and concentration for extended periods. (Tr. at 179-81.) Dr. Smith stated that Claimant retained "the ability to learn and perform simple, unskilled work-like activities." (Tr. at 181.) On March 23, 2007, Dr. Jeffrey Harlow, Ph.D., reviewed the evidence of record and affirmed Dr. Smith's opinion. (Tr. at 183.)

Claimant was referred by Michael A. Muscari, M.D., to M. Khalid Hasan, M.D., F.A.P.A., for a psychiatric evaluation on July 2, 2007. (Tr. at 207-09.) Claimant complained of ongoing anxiety and depression, and reported that he felt as if he had no motivation, energy, or interest in pleasurable activities. (Tr. at 207.) He reported that for the past seven months, he had experienced rapid heart heart and features of panic. (Id.) Claimant noted that at times, he was scared to be around people. (Id.) Claimant described precipitating factors to include nerves and panic, back pain, and other medical problems. (Id.) On mental status exam, Dr. Hasan noted that Claimant's affect was somewhat dysphoric, that his speech was clear but lacked spontaneity, and that his insight, judgment, and problem solving abilities were poor. (Tr. at 208.) However, Claimant's cognition was noted to be intact, he had no bizarre thought processes, tangential, or circumstantial thinking. (Id.) Claimant was capable of remembering his name and address, spelling the word "world" forwards and backwards, and had difficulty performing serial sevens. (Id.)

Though Dr. Hasan did not conduct any formal testing, he opined that Claimant's intelligence was in the average range. (Id.) Dr. Hasan diagnosed major depression, recurrent, moderate to moderately severe in nature; a history of substance abuse, mixed type, predominantly alcohol; a history of panic disorder; and a global assessment of functioning of 40-45. (Tr. at 208.) Dr. Hasan recommended counseling, church attendance, and exercise, and prescribed Klonopin 1mg and Effexor

17

75mg. ((Tr. at 208-09.)

On September 6, 2007, Dr. Hasan completed a form Medical Assessment of Ability to Do Work-Related Activities (Mental) and a form Psychiatric Review Technique. (Tr. at 213-15, 216-29.) Dr. Hasan opined that Claimant would have a fair to poor ability to perform work-related activities on a daily basis in a regular setting. (Tr. at 213-15.) Specifically, he opined that Claimant's abilities in the following areas were fair: follow work rules, relate to co-workers, deal with the public, use judgment, function independently, maintain personal appearance, and demonstrate reliability. (Tr. at 213-14.) He further opined that Claimant retained poor ability to interact with supervisors, deal with work stresses, maintain attention and concentration, behave in an emotionally stable manner, and relate predictably in social situations. (Id.) Dr. Hasan also noted that Claimant's abilities to understand, remember, and carry out simple, detailed, and complex job instructions were poor. (Tr. at 214.) Dr. Hasan noted that Claimant had difficulty concentrating and sleeping, which combined with his back pain, affected his ability to maintain employment. (Tr. at 215.)

On the form Psychiatric Review Technique, Dr. Hasan opined that Claimant's mental impairment met Listing 12.04 and resulted in mild limitations in activities of daily living and moderate limitations in maintaining social functioning, concentration, persistence, or pace. (Tr. at 216-29.) He found that the evidence was insufficient to establish repeated episodes of decompensation. (Tr. at 226.)

Claimant submitted to the Appeals Council his medical records from the West Virginia Division of Corrections, dated May 18, 2006, through May 19, 2006. (Tr. at 234-41.) These records revealed chronic problems to include low back pain, hearing loss, HCV, hepatitis B, mild elevation of liver functioning, dyslipidemia, and depression. (Tr. at 238-39.) Additionally, Claimant submitted

18

to the Appeals Council a medical report from Debra Mooney, MSN, RN, APRN, dated September 13, 2007, which demonstrated that Claimant was diagnosed with hepatitis C, for which he was receiving treatment. (Tr. at 242.)

The ALJ gave minimal weight to the assessment of Dr. Cabauatan because it was based on a single examination that did not reflect any significant objective findings and reported Claimant's alleged symptoms of hepatitis B and C and cirrhosis of the liver without any corroboration. (Tr. at 20.) As the Commissioner notes, contrary to Claimant's allegation, the ALJ did not discredit entirely Dr. Cabauatan's opinion. Rather, based on the single examination of Claimant, lack of significant objective findings, and lack of corroboration regarding Claimant's liver conditions, the ALJ determined that Dr. Cabauatan's opinion was not entitled controlling weight. (Tr. at 20.) Dr. Cabauatan's assessment contained no objective findings and only a listed summary of Claimant's conditions and diagnoses. The ALJ properly noted that the assessment set forth no objective findings and only Claimant's subjective reports. Other than Claimant's subjective reports, the record before the ALJ contained no objective evidence regarding Claimant's hepatitis B and C or cirrhosis of the liver.  Accordingly, the undersigned finds that the ALJ's decision to accord minimal weight to Dr. Cabauatan's assessment is supported by substantial evidence of record.

The ALJ also accorded the assessment of Dr. Hasan limited weight because it was based on a single examination and was consistent neither with Dr. Hasan's objective findings nor his conclusion that the degree of Claimant's limitations was mild to moderate. (Tr. at 20.) As did Dr. Cabauatan, Dr. Hasan examined Claimant on one occasion and then later opined that he was disabled. Though Dr. Hasan noted some abnormalities during his mental status examination, particularly regarding his affect, insight, and judgment, these findings did not objectively support Dr. Hasan's

19

assessed extreme limitations. Furthermore, though Dr. Hasan opined that Claimant was disabled, he assessed only mild to moderate limitations. The ALJ thus properly determined that Dr. Hasan's opinion was inconsistent with his objective findings and conclusion regarding the Listings. Accordingly, the undersigned finds that the ALJ's decision to accord limited weight to the opinion of Dr. Hasan is supported by substantial evidence.

Finally, the undersigned notes that the ALJ gave the opinions of the state agency medical consultants some, but not controlling weight because the consultants did not have the opportunity to observe Claimant or consider additional evidence subsequent to their review of the record. (Tr. at 20.) Pursuant to 20 C.F.R. § 416.927(f)(2)(i), the ALJ properly considered the opinions of the state agency medical consultants, but determined that they were not accorded controlling weight due to the consultants' inability to observe Claimant and review the evidence subsequent to their assessments. The undersigned finds that the ALJ's assessment of the state agency consultants' opinions was in conformity with the Regulations and supported by substantial evidence.

2. Pain & Credibility.

Claimant next alleges that the ALJ erred in assessing Claimant's pain and credibility by failing to explain her conclusion. (Document No. 13 at 8-9.) The Commissioner asserts that the ALJ's credibility assessment is supported by substantial evidence. (Document No. 14 at 12-14.)

A two-step process is used to determine whether a claimant is disabled by pain or other symptoms. First, objective medical evidence must show the existence of a medical impairment that reasonably could be expected to produce the pain or symptoms alleged.  20 C.F.R. §§ 404.1529(b) and 416.929(b) (2006); SSR 96-7p; See also, Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1996).  If such an impairment is established, then the intensity and persistence of the pain or symptoms and the

extent to which they affect a claimant's ability to work must be evaluated.  Id. at 595.  When a claimant proves the existence of a medical condition that could cause the alleged pain or symptoms, "the claimant's subjective complaints [of pain] must be considered by the Secretary, and these complaints may not be rejected merely because the severity of pain cannot be proved by objective medical evidence." Mickles v. Shalala, 29 F.3d 918, 919 (4th Cir. 1994). Objective medical evidence of pain should be gathered and considered, but the absence of such evidence is not determinative. Hyatt v. Sullivan, 899 F.2d 329, 337 (4th Cir. 1990). A claimant's symptoms, including pain, are considered to diminish her capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical and other evidence.  20 C.F.R. §§ 404.1529(c)(4) and 416.929(c)(4) (2006).  Additionally, the Regulations provide that:

> [w]e will consider all of the evidence presented, including information about your prior work record, your statements about your symptoms, evidence submitted by your treating, examining, or consulting physician or psychologist, and observations by our employees and other persons.  . . .  Factors relevant to your symptoms, such as pain, which we will consider include:
>
> (i) Your daily activities;
>
> (ii) The location, duration, frequency, and intensity of your pain or other symptoms.
>
> (iii) Precipitating and aggravating factors;
>
> (iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms;
>
> (v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms;
>
> (vi) Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 or 20 minutes every hour, sleeping on a board, etc.); and
>
> (vii) Other factors concerning your functional limitations and restrictions due to pain

21

or other symptoms.

20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3) (2006).

SSR 96-7p repeats the two-step regulatory provisions:

First, the adjudicator must consider whether there is an underlying medically determinable physical or mental impairment(s)--i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques--that could reasonably be expected to produce the individual's pain or other symptoms. * * * If there is no medically determinable physical or mental impairment(s), or if there is a medically determinable physical or mental impairment(s) but the impairment(s) could not reasonably be expected to produce the individual's pain or other symptoms, the symptoms cannot be found to affect the individual's ability to do basic work activities.

Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the individual's pain or other symptoms has been shown, the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities. For this purpose, whenever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record.

SSR 96-7p, 1996 WL 374186 (July 2, 1996). SSR 96-7p specifically requires consideration of the "type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms" in assessing the credibility of an individual's statements. Significantly, SSR 96-7p requires the adjudicator to engage in the credibility assessment as early as step two in the sequential analysis; i.e., the ALJ must consider the impact of the symptoms on a claimant's ability to function along with the objective medical and other evidence in determining whether the claimant's impairment is "severe" within the meaning of the Regulations. A "severe" impairment is one which significantly limits the physical or mental ability to do basic work activities. 20 C.F.R. §§ 404.1520(c) and 416.920(c).

Craig and SSR 96-7p provide that although an ALJ may look for objective medical evidence

22

of an underlying impairment capable of causing the type of pain alleged, the ALJ is not to reject a claimant's allegations solely because there is no objective medical evidence of the pain itself. Craig, 76 F.3d at 585, 594; SSR 96-7p ("the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record"). For example, the allegations of a person who has a condition capable of causing pain may not be rejected simply because there is no evidence of "reduced joint motion, muscle spasms, deteriorating tissues [or] redness" to corroborate the extent of the pain. Id. at 595. Nevertheless, Craig does not prevent an ALJ from considering the lack of objective evidence of the pain or the lack of other corroborating evidence as factors in his decision. The only analysis which Craig prohibits is one in which the ALJ rejects allegations of pain solely because the pain itself is not supported by objective medical evidence.

The ALJ noted the requirements of the applicable law and Regulations with regard to assessing pain, symptoms, and credibility. (Tr. at 17-18.) The ALJ found, at the first step of the analysis, that Claimant's "medically determinable impairments could reasonably be expected to produce the alleged symptoms." (Tr. at 18.) Thus, the ALJ made an adequate threshold finding and proceeded to consider the intensity and persistence of Claimant's alleged symptoms and the extent to which they affected Claimant's ability to work. (Tr. at 18-20.) At the second step of the analysis, the ALJ concluded that Claimant's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." (Tr. at 18.)

The Court finds that the ALJ properly considered the factors under 20 C.F.R. §§ 404.1529(c)(4) and 416.929(c)(4), in evaluating Claimant's pain and credibility. The ALJ acknowledged Claimant's complaints of back pain due to a bulging disc and his reports that he sometimes threw out his back simply by lifting a gallon of milk. (Tr. at 18, 255.) The ALJ thus noted

23

the nature and location of Claimant's pain, and further noted the testimony that Claimant could not sit very long before his back hurt. (Tr. at 18, 254.) The ALJ further acknowledged Claimant's reported side effects from his liver treatment, including nausea, vomiting, and pain, and noted that at times, he took only Ibuprofen for pain in his back and legs. (Tr. at 18, 252-53, 257.) However, the medical record further indicated that he was prescribed Ultram, Lortab, and Skelaxin. (Tr. at 19.) Claimant testified that he had difficulty being around other people, had feelings of worthlessness, and had limited interests and activities. (Tr. at 18, 258) The ALJ also summarized Claimant's testimony regarding his activities of daily living, including his statements that he cared for his own personal needs, warmed up leftover food, paid bills, and watched television. (Tr. at 18, 20, 253.)

Despite Claimant's conditions, the ALJ noted that Claimant had not required any hospitalizations, surgery, or emergency room treatment for his conditions. (Tr. at 20.) He further noted that Claimant neither required an assistive device to stand or walk, nor exhibited any neurological deficits. (Id.) Moreover, the ALJ noted that despite Claimant's alleged medication side effects from treatment for his hepatitis C, the medical records failed to document any reported side effects. (Id.) Finally, the ALJ noted that Claimant's medical treatment was limited and conservative in nature, and therefore, diminished Claimant's credibility regarding the frequency and severity of his symptoms, while his admitted activities of daily living and observed ability to function by treating and consulting examiners discounted the extent of his alleged functional limitations. (Id.)

Based on the foregoing, the undersigned finds that the ALJ specifically set forth in hrt decision the reasons for hrt finding that Claimant was not entirely credible. Without any other specific objection to the ALJ's pain and credibility assessment, the undersigned finds that the ALJ's decision is supported by substantial evidence and that Claimant's argument is without merit.

24

3. <u>Hypothetical Questions</u>.

Finally, Claimant alleges that the ALJ erred in relying upon the answer only to one hypothetical question out of several posed to the VE, which assumed that Claimant had minimal limitations from psychiatric impairments and was capable of performing a full range of light exertional work. (Document No. 13 at 9.) Claimant contends that the ALJ's hypothetical question arbitrarily discounted Claimant's mental limitations identified by Dr. Hasan. (<u>Id.</u>)

The Commissioner asserts that because the ALJ properly gave Dr. Hasan's opinion limited weight, he was not required to incorporate the limitations he identified into the hypothetical question posed to the VE or into his Residual Functional Capacity ("RFC") assessment. (Document No. 14 at 14.) Accordingly, the Commissioner contends that the ALJ properly relied upon the VE's response to the hypothetical question which incorporated all the limitations included in the ALJ's RFC assessment. (<u>Id.</u>) The ALJ's reliance on the hypothetical question and the VE's response that Claimant was capable of performing jobs in the economy provides substantial evidence to support the ALJ's decision. (<u>Id.</u> at 14-15.)

To be relevant or helpful, a vocational expert's opinion must be based upon consideration of all evidence of record, and it must be in response to a hypothetical question which fairly sets out all of the claimant's impairments. <u>Walker v. Bowen</u>, 889 F.2d 47, 51 (4th Cir. 1989). "[I]t is difficult to see how a vocational expert can be of any assistance if he is not familiar with the particular claimant's impairments and abilities – presumably, he must study the evidence of record to reach the necessary level of familiarity." <u>Id.</u> at 51. Nevertheless, while questions posed to the vocational expert must fairly set out all of claimant's impairments, the questions need only reflect those impairments that are supported by the record. <u>See</u> <u>Chrupcala v. Heckler</u>, 829 F.2d 1269, 1276 (3d Cir. 1987). Additionally, the hypothetical question may omit non-severe impairments, but must include those

25

which the ALJ finds to be severe. See Benenate v. Schweiker, 719 F.2d 291, 292 (8th Cir. 1983).

In the ALJ's hypothetical questions to the VE, he included all of Claimant's impairments that were supported by the record. (Tr. at 262-64.) The ALJ first asked whether a person of Claimant's age, education, and past relevant work experience, who was limited to lifting or carrying occasionally twenty pounds and frequently lifting or carrying ten pounds; standing and walking for six hours in an eight-hour workday; kneeling, crawling, stooping, or crouching occasionally; avoiding work around hazardous machinery or polluted environments; no climbing ladders, rope, or scaffolds; and performing one or two-step tasks or instructions and unskilled work with occasional interaction with co-workers, could perform any work. (Tr. at 262.) In response to the ALJ's hypothetical, the VE responded that such person could not perform any of Claimant's past relevant work. (Tr. at 263.) The ALJ then asked whether a person described in the first hypothetical, who was a younger person with a seventh grade education could perform any jobs. (Id.) The ALJ responded that such a person could perform jobs such as a laundry folder, garment folder, and laundry laborer, which were unskilled jobs and the light level of exertion. (Id.)

The ALJ further asked the VE whether an individual described in the first hypothetical, combined with Dr. Hasan's assessed limitations contained in Exhibit 15F, could perform any jobs. (Tr. at 264.) The VE responded that such person could not perform any of Claimant's past relevant work. (Id.) The ALJ finally asked whether a younger individual with a limited education, who had the limitations set forth in the third hypothetical could perform any work. (Id.) The VE responded that such person could perform no other jobs. (Id.)

Based on the foregoing, the undersigned finds that the ALJ presented a hypothetical question to the VE that contained Claimant's physical and mental limitations supported by the record. As previously discussed, the ALJ's decision to accord Dr. Hasan's opinion limited weight was supported

by substantial evidence. Consequently, the ALJ was not required to incorporate the limitations assessed by Dr. Hasan into the hypothetical questions posed to the VE because he found that the limitations were neither consistent with Dr. Hasan's objective findings nor his conclusion that Claimant's limitations were mild to moderate in nature. The ALJ incorporated into her hypothetical questions those limitations that were supported by the evidence of record. Accordingly, the undersigned finds that the ALJ's reliance upon the VE's response to the first two hypothetical questions, that Claimant was capable of performing a significant number of jobs in the economy, provides substantial evidence to support the ALJ's decision that Claimant was not disabled. For these reasons, the undersigned finds that the ALJ's hypothetical questions to the VE were proper and in accordance with the applicable law and Regulations, and therefore, that the ALJ's decision is supported by substantial evidence.

For the reasons set forth above, it is hereby respectfully **RECOMMENDED** that the District Court confirm and accept the foregoing findings, **DENY** Plaintiff's Motion for Judgment on the Pleadings (Document No. 12.), **GRANT** the Defendant's Motion for Judgment on the Pleadings (Document No. 14.), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this matter from the Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Thomas E. Johnston, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(e) and 72(b), Federal Rules of Civil Procedure, the parties shall have three days (mailing/service) and then ten days (filing of objections) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions

of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection.  Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals.  Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 (1985); Wright v. Collins, 766 F.2d 841, 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir. 1984).  Copies of such objections shall be served on opposing parties, District Judge Johnston, and this Magistrate Judge.

The Clerk is directed to file this Proposed Findings and Recommendation and to send a copy of the same to counsel of record.

Date: February 27, 2009.

R. Clarke VanDervort
United States Magistrate Judge